IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **KIMBERLY SUE CHEWIE,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v.                                                                ) | Case No. 12-CV-590-PJC |
| ) | |
| **CAROLYN W. COLVIN,** ) | |
| **Acting Commissioner of the** ) | |
| **Social Security Administration,**[1] ) | |
| ) | |
| **Defendant.** ) | |

**OPINION AND ORDER**

Claimant, Kimberly Sue Chewie ("Chewie"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying her applications for disability insurance benefits and supplemental security income benefits under the Social Security Act, 42 U.S.C. §§ 401 *et seq*. In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge. Any appeal of this order will be directly to the Tenth Circuit Court of Appeals. Chewie appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that Chewie was not disabled. For the reasons discussed below, the Court **AFFIRMS** the Commissioner's decision.

---

[1] Pursuant to Fed. R. Civ. P. 25(d)(1), Carolyn W. Colvin, the current Acting Commissioner of the Social Security Administration, is substituted for Michael J. Astrue as Defendant in this action. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

**Claimant's Background**

Chewie was 46 years old at the time of the hearing before the ALJ on December 10, 2010. (R. 38). She did not graduate from high school and did not have a GED. (R. 42). She did attend a cosmetology vocational school. (R. 41). Chewie had previously worked on an assembly line and as a beautician. (R. 61-62). Her last job was at a convenient store where she operated the cash register and stocked the coolers. (R. 61).

Chewie alleged an inability to work due to a problem with her left hand. (R. 47). She testified that she had injured her hand in a car accident. (R.47-58). She said that she did not have any feeling in the ring and middle fingers, down into the palm, or up the side of the thumb. (R. 48). She stated that these areas had been numb since the accident. *Id.* She also said that she could only feel heat with the index finger. (R. 50).

Chewie testified that she experienced what she described as "ghost pains" in her left hand. (R. 48). She explained that such pains felt as if someone was taking a knife and running it down her fingers. *Id.* She said that these pains occurred mainly in cold weather. *Id.* She estimated that the pain occurred once a day and lasted ten to thirty minutes. (R. 48-49).

Chewie stated that she could hardly use her left hand to pick up any weight nor could she flatten her hand out completely. (R. 48). She said that she could not make a fist with her left hand and she also had a difficult time opening up her hand enough to grip or carry things. (R. 49-51). She stated that she could hold the steering wheel, but driving for a long period of time bothered her hand. (R. 51).

Chewie additionally mentioned that as a result of her hand pain, she experienced interrupted sleep. (R. 60). She testified that she would get five to six hours of sleep per night. (R. 61). She would sleep for an estimated four hours and then wake up for one to two hours. *Id.*

She testified that she sometimes went back to sleep but would get up at five or six o'clock every morning. *Id.*

In the two months following the accident, Chewie had problems performing normal daily functions such as dressing and showering, so her husband had to assist her. (R. 59). When her hand began healing, she was able to perform these functions on her own. *Id.* She stated that she was able to cook, could lift pan lids with her left hand, and go grocery shopping. (R. 59-60). She stated she still required the assistance of her husband in chores which required heavy lifting. (R. 60).

According to Chewie, although she had previously worked on an assembly line and as a hairdresser, she did not think that she would be able to return to either of those jobs because they required the use of both of her hands. (R. 62). She also believed that she was unable to return to her job at the convenient store because it required lifting heavy milk cartons with both hands to stock the freezers. *Id.* She testified that she was unable to do even one-third of the things she used to do with her left hand. *Id.*

Chewie presented to the emergency room by ambulance at Washington Regional Medical Center ("Washington") on May 13, 2009, following a roll-over motor vehicle crash that resulted in complaints of left wrist and forearm injuries. (R. 274-96). On initial examination, Chewie admitted to consuming two alcoholic drinks prior to the accident. (R. 277). Observations of her injuries included abrasions to the left forearm and a large skin and tendon laceration to the left palm. *Id.* It was also noted that she had no sensation in her fingertips. (R. 275). X-rays indicated an oblique extra-articular fracture of the distal left fifth metacarpal with mild palmar angulation of the distal fracture fragment. (R. 292). Chewie was diagnosed by Andrew D. Heinzelmann, M.D., with degloving of the palmar aspect of the left hand with a fifth metacarpal

3

neck fracture. (R. 272, 274).

Dr. Heinzelmann then performed surgical irrigation and debridement of the left hand and a complex laceration repair. (R. 274). In her postoperative assessment, she reported improved sensation on the index and small finger and thumb. (R. 264). She also had regained brisk capillary refill to all fingers. *Id.*

Chewie presented to Christopher Noel Henley, M.D., at Ozark Orthopaedics ("Ozark") on May 22, 2009, for a surgery follow-up and dressing change, as ordered by Dr. Heinzelmann. (R. 256-58). During the examination, Dr. Henley noted that Chewie appeared to be experiencing an appropriate amount of pain, swelling, and had serious drainage of the left hand. (R. 257). Dr. Henley noted that possible exploration of the wound could be necessary if her injuries had not improved by her next visit. (R. 256).

On May 26, 2009, Chewie reported to Ozark for a second follow-up and dressing change with Dr. Henley. (R. 255). He noted that she had not shown much improvement as her pain remained constant and she denied any returned sensation in her ring and middle finger. *Id.* She was diagnosed with digital nerve injury in the left and middle finger with possible nerve damage to the right index finger, and a skin laceration with likely seroma.[2] *Id.* Dr. Henley recommended that Chewie proceed with surgical intervention to explore the wound, verify the integrity of the nerves, deride the skin flap as necessary, and possibly perform a full thickness skin grafting where appropriate. *Id.* She agreed with the plan to proceed with the surgery. *Id.*

---

[2] Seroma is a tumor-like collection of serum, or the clear portion of any body fluid, in the tissues. *Dorland's Illustrated Medical Dictionary* 1628-29 (29th ed. 2000) (hereinafter "Dorland's").

4

Chewie arrived at Washington on May 28, 2009, for her scheduled exploratory surgery with Dr. Henley. (R. 262). During surgery, Dr Henley discovered significant nerve damage, including seroma with partial flap necrosis.[3] *Id.* Dr. Henley performed a full thickness skin graft by harvesting skin from her groin, repaired her digital nerves in her ring, middle, and index fingers, and debited her skin and subcutaneous tissue. *Id.* She was then discharged with her hand in a splint and a prescription for narcotic pain medication. *Id.*

On June 1, 2009, Chewie presented to Dr. Henley at Ozark for her postoperative wound check. (R. 321). Dr. Henley removed the drain from her skin graft. *Id.* She complained of heightened pain even though her swelling had gone down. *Id.* Dr. Henley noted concern about stiffness in her hand but more concern about proper healing of the skin. *Id.*

Chewie returned to Ozark on June 8, 2009, to have most of her sutures removed. (R. 320). Dr. Henley noted that the skin graft had taken well but that there were areas of epidermal lysis[4] that would need wet to dry dressing changes. *Id.* He further noted that her hand was "extraordinarily stiff" and that physical therapy would be ordered in her next visit. *Id.* She was prescribed more pain medication. *Id.*

Chewie saw Dr. Henley on June 15, 2009, at Ozark for removal of the final sutures. (R. 319). Dr. Henley noted that there was some seroma between her thumb and index finger. *Id.* He ordered Chewie to begin aggressive physical therapy and continue moist to dry dressings on the raw areas between her ring and middle fingers. *Id.* Her narcotics prescription was also refilled.

---

[3] Necrosis is the sum of the morphological changes indicative of cell death and caused by the progressive degradative action of enzymes; it may affect groups of cells or part of a structure or an organ. *Dorland's* at 1180.

[4] Epidermal lysis is the destruction of cells of the outermost and nonvascular layer of the skin. *Dorland's* at 605, 1041.

*Id.*

On June 22, 2009, Chewie reported continued pain to Dr. Henley. (R. 318). He noted that the skin graft had gotten hard and had not yet become supple. *Id.* Dr. Henley was pleased to find that Chewie had better than expected flexion of the index, middle and ring fingers. *Id.* However, Dr. Henley noted that she was experiencing pain in her small finger with attempted passive flexion, and her thumb was extraordinarily stiff. *Id.* Dr. Henley also found that distal joints of her others fingers were stiff. *Id.* Chewie explained that she could not go to physical therapy for her hand twice a week at Ozark because of the distance and requested changing to a physical therapist closer to home. *Id.* Dr. Henley recommended that the new physical therapist contact him. *Id.*

Chewie returned to Ozark on July 6, 2009 and Dr. Henley reported that he thought the therapy was helping because she seemed to be doing better. (R. 317). He noted that her hand looked 80% cleaner than her previous visit, but there were still some raw areas that were healing. *Id.* Dr. Henley told Chewie to continue with the therapy and wound care and refilled her pain prescription. *Id.*

On July 14, 2009, Chewie returned to Ozark for x-rays and pin removal. (R. 316). Dr. Henley noted that there was some osteolysis of the hamate[5] in the fifth finger, and it was worse than the previous x-ray. *Id.* He continued with removal of the pins in her fifth finger. *Id.* Chewie maintained that she was feeling better and happy with her progress. *Id.* She reported that she had even tried cutting hair again with her hand. *Id.* Dr. Henley stated that her range of motion was improving slightly but still extremely limited. *Id.* She was also able to pinch with

---

[5] Osteolysis of the hamate is the dissolution or removal of calcium in the hook of the bone. *Dorland's* at 784, 1288.

6

her fingers. *Id.* Dr. Henley ordered continued treatment and wound care. *Id.*

Chewie presented to Ozark on July 28, 2009, for a follow-up appointment. (R. 315). Dr. Henley noticed that she had burnt the tips of her middle and ring finger, and that they had begun to blister. *Id.* Dr. Henley also noted that there had been some significant contracture of the full thickness skin graft in her left palm. *Id.* Limited range of motion of the thumb was noted. *Id.* He further noted that she may need additional surgical intervention if aggressive occupational therapy did not yield range of motion improvement. *Id.*

Chewie saw Dr. Henley on October 15, 2009, and reported that overall, she was happy with the results and had even started driving again with her left hand. (R. 313-14). However, she did report occasional sharp pain. *Id.* Dr. Henley noted that she still had numbness in her left middle and ring fingers but sensation was returning in her index finger. *Id.* He concluded that the nerve repair in her index finger had been successful but noted concern that the other nerve repairs were less successful. *Id.* He explained to Chewie that she needed to continue aggressive stretching and passive range of motion exercises and advised her that further surgery may still be required in the future. *Id.*

Agency consultant David Wiegman, M.D., examined Chewie on August 22, 2009. (R. 297-303). On examination, Dr. Wiegman noted an obvious abnormality of Chewie's left hand with very bad scarring and skin grafts. (R. 298). Chewie had normal arm and leg strength at 5/5 with slightly decreased muscle strength in her left arm at 4/5. *Id.* She also had normal grip strength in her right hand, but zero grip strength in her left hand. *Id.* She was unable to fully flex or fully extend the fingers on her left hand. *Id.* Range of motion was normal everywhere except her left hand, and could not fully flex or extend those fingers. *Id.* She experienced no sensation to touch in her left third and fourth digits. *Id.* Straight leg raising was negative, and toe and heel

walking was normal. *Id.* She had a normal, symmetric gait. *Id.* Chewie had good coordination with normal opposition of the thumb to fingers in the right hand, but not with the left. *Id.* Dr. Wiegman's impression was severe left hand injury with minimal movement and constant numbness, and essentially the loss of use of her left hand. *Id.* It was noted that Chewie was right handed and was still going to physical therapy. *Id.* The Hand/Wrist Sheet showed that Chewie had limited range of motion in flexion and hyper-extension of her left hand. (R. 302). The Functional Evaluation Assessment reflected that she could not use her left hand to manipulate small objects, effectively grasp tools such as a hammer, or effectively oppose the thumb to the fingertips. *Id.*

Agency consultant Thurma Fiegel, M.D., completed a Physical Residual Functional Capacity Assessment dated September 28, 2009. (R. 304-11). Dr. Fiegel's opinion was that Chewie could occasionally lift and carry up to twenty pounds and could frequently lift and carry up to ten pounds. (R. 305). She further concluded that Chewie could stand, walk, and sit with normal breaks for up to six hours in an eight-hour work day, and she had a limited ability to push and pull with her upper extremities. *Id.* In the space for narrative explanation, Dr. Fiegel noted Chewie's surgery on May 28, 2009. *Id.* She summarized the medical evidence and Dr. Wiegman's examination. *Id.* She mentioned that Chewie was unable to operate controls with her left hand. (R. 305-06). For manipulative limitations, Dr. Fiegel noted that Chewie was limited in gross manipulation or handling and fine manipulation or fingering with only her left hand. (R. 307). She found that no other limitations were established. (R. 306-11).

Agency consultant John Pataki, M.D., completed an independent review of the medical evidence and the Physical Residual Functional Capacity Assessment completed by Dr. Fiegel on December 18, 2009. (R. 322). Dr. Pataki concurred with the Dr. Fiegel's assessment of Chewie.

8

*Id.*

## Procedural History

Chewie filed applications in June 2009, seeking disability insurance benefits under Title II, and supplemental security income benefits under Title XVI, 42 U.S.C. §§ 401 *et seq*. (R. 134-40). In both applications, Chewie alleged onset of disability as May 13, 2009. (R. 134-38). The applications were denied initially on September 28, 2009, and on reconsideration on December 18, 2009. (R. 86-93, 94-99). A hearing before ALJ John W. Belcher was held December 10, 2010. (R. 34-69). By decision dated January 10, 2011, the ALJ found that Chewie was not disabled from May 13, 2009 through the date of the ALJ's decision. (R. 22-30). On March 30, 2011, the Appeals Council denied review of the ALJ's findings. (R. 7-12). Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of this appeal. 20 C.F.R. §§ 404.981, 416.1481.

## Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. § 404.1520.[6] *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988) (detailing

---

[6] Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510. Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his

9

steps).  "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Id.*

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g).  This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.*  The court's review is based on the record taken as a whole, and the court will "meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'" *Id.* (*quoting Washington v. Shalala*), 37 F.3d 1437, 1439 (10th Cir. 1994).  The court "may neither reweigh the evidence nor substitute" its discretion for that of the Commissioner.  *Hamlin,* 365 F.3d at 1214 (quotation omitted).

## Decision of the Administrative Law Judge

The ALJ found that Chewie met insured status requirements through December 13, 2013.

---

ability to do basic work activities.  *See* 20 C.F.R. § 404.1520(c).  If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied.  At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings").  A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry.  If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work.  If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform.  *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001).  Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

(R. 24). At Step One, the ALJ found that Chewie had not engaged in any substantial gainful activity since her alleged onset date of May 13, 2009. *Id.* At Step Two, the ALJ found that Chewie had a severe impairment in her left hand. *Id.* At Step Three, the ALJ found that Chewie's impairment, or combination of impairments, did not meet a Listing. *Id.*

The ALJ determined that Chewie had the RFC to lift and/or carry no more than twenty pounds occasionally and ten pounds frequently, walk for six to eight hours out of an eight hour work day, and sit for no more than six to eight hours out of an eight hour work day. (R. 25). Chewie was unable to perform fine and gross manipulation with the left hand, and she had no feeling with the thumb, middle, and right fingers of the left hand. *Id.* At Step Four, the ALJ found that Chewie was unable to perform any past relevant work. (R. 28-29). At Step Five, the ALJ found that there were significant numbers of jobs in the national economy that Chewie could perform, taking into account her age, education, work experience, and RFC. (R. 29). Therefore, the ALJ found that Chewie was not disabled from May 13, 2009, through the date of his decision. (R. 30).

## Review

Chewie asserts only one point of error on appeal. She argues that the ALJ failed to properly evaluate her credibility. Regarding this issue, the undersigned finds that the ALJ's decision is supported by substantial evidence and complies with legal requirements. Therefore, the ALJ's decision is affirmed.

Once a medically determinable impairment is established that could reasonably be expected to produce symptoms complained of, the ALJ is required to evaluate the intensity, persistence, and functionally limiting effects of the symptoms. 20 C.F.R. §§ 404.1529(c), 404.929(c). In order to do this, the ALJ must assess the credibility of the claimant's statements

11

regarding the symptoms and their functional effects. Social Security Ruling ("SSR") 96-7p, 1996 WL 374186, at *1. Credibility determinations by the trier of fact are given great deference. *Hamilton v. Sec'y. of Health & Human Servs.,* 961 F.2d 1495, 1499 (10th Cir. 1992).

> The ALJ enjoys an institutional advantage in making [credibility determinations]. Not only does an ALJ see far more social security cases than do appellate judges, [the ALJ] is uniquely able to observe the demeanor and gauge the physical abilities of the claimant in a direct and unmediated fashion.

*White v. Barnhart,* 287 F.3d 903, 910 (10th Cir. 2002). "[C]ommon sense, not technical perfection, is [the] guide" of a reviewing court. *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1167 (10th Cir. 2012). In evaluating credibility, an ALJ must give specific reasons that are closely linked to substantial evidence. *See Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995); SSR 96-7p, 1996 WL 374186. Some of the factors the ALJ may consider in assessing the credibility of a claimant's complaints include "the levels of medication and their effectiveness, the extensiveness of the attempts... to obtain relief, the frequency of medical contacts, the nature of the daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ,... and the consistency of compatibility of nonmedical testimony with objective evidence." *Kepler*, 68 F.3d at 391 (quotation and citation omitted).

In addressing Chewie's credibility, the ALJ found that Chewie's "statements about her impairments and their impact on her ability to perform activities of daily living and basic functions are not entirely credible in light of discrepancies between the claimant's alleged symptoms, and objective documentation in the file." (R. 28). The ALJ also noted that "in consideration of all the medical evidence, there appear[red] to be some inconsistency regarding functional limitations and allegations, yielding to a partial allegation credibility assumption." (R. 29). Although these statements consisted primarily of boilerplate language and standing alone,

they would be insufficient to support the credibility analysis, the ALJ did consider other factors and a more thorough analysis was conducted to support the ALJ's determination. *Kruse v. Astrue*, 436 Fed. Appx. 879, 887 (10th Cir. 2011). The ALJ could have been more detailed in his credibility analysis, but he did set forth sufficient and specific reasons for his finding that Chewie lacked credibility.

For example, the ALJ discussed Chewie's conservative treatment and lack of continuing surgical care. (R. 29). The extent of the claimant's efforts to obtain relief is a legitimate specific reason for a finding of credibility. *Kepler*, 68 F.3d at 391; *Hagar v. Barnhart*, 102 Fed. Appx. 146, 148 (10th Cir. 2004) (unpublished) (ALJ was entitled to consider that, if the claimant's symptoms were as debilitating as asserted, she would have sought additional treatment). The ALJ also stated that there were no opinions of treating or examining physicians indicating that Chewie was disabled or had limitations greater than those found in his RFC determination. (R. 29). The Tenth Circuit has affirmed decisions in which the credibility was based in part on the fact that no treating physician had placed restrictions on claimant. *See*, *e.g.*, *Boswell v. Astrue*, 450 Fed. Appx. 776, 778 (10th Cir. 2011) (unpublished); *Holden v. Astrue*, 274 Fed. Appx. 675, 686 (10th Cir. 2008) (unpublished).

The ALJ also discussed Chewie's daily activities in fairly extensive detail and concluded that they were not limited to the extent one would expect, given her complaints of disabling symptoms and limitations. (R. 28). It is entirely proper for an ALJ to consider a Claimant's activities of daily living ("ADLs") when evaluating credibility. *Hamlin*, 365 F.3d at 1220. Consideration of Chewie's ADLs, which were more than minimal, as one aspect of the ALJ's credibility finding was not in error where it was not the sole reason for her determination. *Kruse*, 436 Fed. Appx. at 886; *see also Cobb v. Astrue*, 364 Fed. Appx. 445, 450 (10th Cir. 2010)

(unpublished).

All of these were legitimate and specific reasons for finding Chewie less than fully credible, and these reasons were closely linked to substantial evidence. Faced with this assessment, Chewie first argues that it was improper for the ALJ to rely on her daily activities when assessing credibility. Plaintiff's Opening Brief, Dkt. #15, p. 5. However, as discussed above, it is proper for an ALJ to consider a claimant's ADLs. In the cases Chewie relied on in support of her argument, the ALJs had used the claimants' sporadic performances of minimal activities as evidence that the claimants were capable of engaging in substantial gainful activity on a regular and continuing basis (citing *Broadbent v. Harris*, 698 F.2d 407 (10th Cir. 1983); *Byron v. Heckler*, 742 F.2d 1232 (10th Cir. 1984); *Frey v. Brown*, 816 F.2d 508 (10th Cir. 1987); and *Thompson v. Sullivan*, 987 F.2d 1482 (10th Cir. 1993)). The undersigned agrees that if the ALJ had relied solely on her daily activities as an indication that Chewie was capable of engaging in substantial gainful activity on a regular and continuing basis, his assessment could have been improper. Here, however, the ALJ properly considered the consistency of Chewie's daily activities with the severity of symptoms and limitations that she alleged. *See* 20 C.F.R. §§ 404.1529(c)(3)(I), 416.929(c)(3)(I) (stating that the first relevant factor than an ALJ must consider in evaluating a claimant's subjective complaints is daily activities).

Second, Chewie argues that the ALJ contradicts himself by making the observational statement that limited daily activities cannot be objectively verified but then relies on Chewie's daily activities as evidence supporting her ability to work. As Chewie correctly points out, the consideration of the lack of objective verification is one factor to be used in assessing the credibility of her testimony. *See Keyes-Zachary*, 695 F.3d at 1168. Chewie's argument is misguided however, in that the ALJ did not rely solely on the lack of objective verification but

14

rather mentioned it as only one factor, among many, in assessing her credibility.

Chewie also argues that she should not be penalized for her financial inability to afford treatment. The Court agrees that the ALJ should have directly addressed this portion of Chewie's testimony[7] when he addressed her treatment. *See Thomas v. Barnhart*, 147 Fed. Appx. 775, 760 (10th Cir. 2005) (unpublished) (faulting ALJ for failing to comment on evidence that claimant could not afford medications). Had the ALJ included a discussion of this evidence, he would still have been entitled to conclude that her failure to seek treatment was a factor supporting his finding of reduced credibility. *See* 20 C.F.R. §§ 404.1529(c)(3)(v)-(vi). 416.929(c)(3)(v)-(vi) (requiring an ALJ to consider a claimant's treatment and other measures the claimant uses to relieve symptoms in evaluating the claimant's subjective complaints). Morever, even if this factor was omitted from the ALJ's justification of his finding of reduced credibility, the other factors would still be substantial evidence supporting the ALJ's decision. Under these circumstances, the ALJ's failure to explicitly discuss Chewie's testimony that she could not schedule a new appointment until she paid her outstanding bill was harmless error. *See Keyes-Zachary*, 695 F.3d at 1173 (ALJ's failure to mention non-determinative factor was harmless error given circumstance of case).

In sum, the ALJ's credibility assessment here was adequate. Chewie's arguments to the contrary simply are not persuasive. "[T]he ALJ closely and affirmatively linked his adverse credibility finding to substantial evidence in the record and did not employ an incorrect legal standard. 'Our precedents do not require more, and our limited scope of review precludes us from

---

[7] At the hearing, Chewie was asked: "And I think we know why, but just to make sure we make it clear, why haven't you been back to Dr. Henley?" Her response: "Because when I made my follow-up appointments, and so, I still owed him $100 and I think it was $8, 108 they told me until I paid that, I couldn't get an appointment." (R. 57).

15

reweighing the evidence or substituting our judgment for that of the agency.'" *Zaricor-Ritchie*, 452 Fed. Appx. at 824, *citing Wall v. Astrue*, 561 F.3d 1048, 1070 (10th Cir. 2009) (further quotations omitted).

**Conclusion**

The decision of the Commissioner is supported by substantial evidence and the correct legal standards were applied. The decision is **AFFIRMED**.

Dated this 17th day of December 2013.

*[signature]*

Paul J. Cleary
United States Magistrate Judge